IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

MAJOR BROUNSON, JR. and
ENRIQUE D. TERRY,

                Defendants.

CRIMINAL CASE NO.

1:15-CR-00366-ELR-JFK

## **REPORT AND RECOMMENDATION**

Pending before the court are Defendants Brounson's and Terry's motions [Docs. 24 and 27] to suppress evidence, two firearms, and Defendant Brounson's motion [Doc. 28] to suppress statements, all obtained on May 20, 2015, resulting from a warrantless traffic stop, search and arrest. An evidentiary hearing was held on February 19, 2016, on Defendants' motions to suppress.[1] [Doc. 36]. Defendant Terry, who was the passenger in the vehicle searched but otherwise claimed no interest in the vehicle, contends that, because the traffic stop was unlawful, he may seek to suppress the fruits of the unlawful detention including the firearms found as the result of a

---

[1]Citations to the transcript of the hearing are:  (Tr. at ).

warrantless search of the vehicle. [Doc. 37]. In making these arguments, Defendant Terry challenges the credibility of the officers who conducted the traffic stop and search. [Id.]. Defendant Brounson, who was the driver of the vehicle, also challenges the stop of the vehicle as unlawful and, independent of the traffic stop, further challenges the warrantless search of the vehicle. [Doc. 39]. He likewise challenges the credibility of the officers. [Id.]. Finally, Defendant Brounson asserts that his post-arrest statements, made after being informed of and asserting Miranda rights, should be suppressed. [Id. at 4].

In response, the Government contends that the initial traffic stop was lawful and that the vehicle was searched lawfully pursuant to the automobile exception to the warrant requirement. The Government asserts that Defendant Terry, as the passenger, cannot challenge the search of the vehicle. [Doc. 42]. With respect to the post-arrest statement made by Defendant Brounson, the Government advises that the statement will not be used at trial. [Id. at 5 n.2]. Accordingly, Defendant's motion [Doc. 28] to suppress statements is due to be denied as moot.

After consideration of the arguments, record before the court and relevant legal authorities, the court finds that Defendants' motions [Docs. 24 and 27] to suppress evidence should be denied.

2

## I.      Background Facts

On May 20, 2015, Henry County Police Officer and K-9 Handler Nicholas Jackson,[2] in order to monitor traffic, was stationed on I-75 southbound at mile marker 214, which is located south of Georgia State Route 155 and north of Bill Gardner Parkway, the Tanger Outlet Mall exit.[3]  (Tr. at 4-6).  At approximately 8:20 p.m., he observed a white 2015 Nissan Versa ("Nissan" or "the vehicle") traveling in the right lane of traffic following less than one car length behind a tractor-trailer also traveling in that lane.  (Tr. at 7, 38, 40, 53).  Based on his training and experience, Officer Jackson was aware that following too close was a traffic violation.[4]  (Tr. at 7).

---

[2]Officer Jackson was an eleven-year veteran of the police force and had been a traffic officer for over four years.  He had received training and had experience in enforcing state traffic laws. (Tr. at 4-5, 7).  The officer was also a certified handler of a K-9 certified to detect the odors of cocaine, methamphetamine, heroin and marijuana. (Tr. at 4-5).  He testified that he had conducted hundreds of traffic stops and that he was familiar with the smell of raw and burnt marijuana.  In his opinion, the odor of burnt marijuana can linger on items such as a vehicle's cloth seats.  (Tr. at 20-21).

[3]Parked next to Officer Jackson was Henry County Police Officer and K-9 Handler Steve Torbush, a ten-year veteran of the police department.  (Tr. at 55-56, 61). He testified that, based on his experience conducting traffic stops, he was familiar with the different smells of raw and burnt marijuana.  (Tr. at 58).  With the odor of burnt marijuana, although he has found residue, generally if burnt, no marijuana is left so that a search does not locate any marijuana.  (Tr. at 63-64).

[4]The only traffic violation that Officer Jackson observed was the Nissan following the tractor-trailer too closely in heavy traffic.  Although he did not observe

3

After observing the violation, the officer entered onto the expressway and moved to catch-up with the Nissan, maintaining his observation of the vehicle and noting that the Nissan continued to follow the tractor-trailer too closely until the tractor-trailer moved into the center lane.  (Tr. at 8, 39, 42-43).  The officer did not immediately activate his emergency equipment, that is, blue lights and siren, for a number of reasons.  He stated that he is not going to do so until he is behind the vehicle he is stopping because if he activates his lights before that, given the traffic at that time of day, "people start going berserk[.]"  (Tr. at 39).  And the officer chose the location where he wanted to conduct the traffic stop, even after catching-up to the Nissan, to avoid a construction zone and a dangerous exit and on ramp (the Tanger Outlet Mall) at a hill crest with merging and exiting traffic.[5]  (Tr. at 8, 28-29, 42-43).  He testified that before he activated his blue lights, the area was a "terrible location to stop a

_____

any actual danger, he stated that the potential for danger was great.  (Tr. at 44, 46).  He also did not recall any other vehicles following too close or whether traffic slowed as vehicles, such as the tractor-trailer, approached where his patrol vehicle was parked. (Tr. at 29-30, 40-41).

[5]Officer Torbush stated that the construction zone ran from north of the Tanger Outlet Mall exit to approximately the Eagles Landing exit, ending around mile-marker 213 or 212.  (Tr. at 61).

4

vehicle[.]"   (Tr. at 29).   The officer estimated that he followed the Nissan for approximately three miles before activating his blue lights.  (Tr. at 39, 41).

Officer Jackson's patrol vehicle is equipped with a dash video and audio recorder that are activated when the patrol vehicle's emergency equipment is activated. (Tr. at 8).  When he activates the blue lights, the video portion "go[es] back 30 seconds, and that's when it will start recording[;]" however, the audio portion does not record until the point in time when the blue lights are activated.  (Tr. at 8, 27).  For that reason, the video of the traffic stop begins thirty seconds before the officer activated his blue lights to conduct the traffic stop of the Nissan.  He had "caught up to the vehicle" before the video started and before he activated his blue lights.  (Tr. at 12, 42-43; Gov't Exh. 1).  When the video starts, the Nissan is in the center lane, and the officer's patrol vehicle is in the left-hand lane.  The tractor-trailer is not observed on the video.[6]  (Tr. at 10; Gov't Exh. 1).  The officer did not recall where the tractor-trailer was at this point and could only guess its location.  (Tr. at 27-29, 43-44).

After Officer Jackson activated the blue lights, the Nissan pulled over to the side of the road followed by the officer.  (Tr. at 12-13).  The officer exited his vehicle and

---

[6]The officer testified that he did not even think about activating his emergency equipment as soon as he decided to follow the Nissan in order to capture the events he observed.  (Tr. at 39-40).

AO 72A
(Rev.8/82)

approached, due to safety concerns with other traffic, the passenger side of the Nissan. (Tr. at 13). Defendant Terry was the vehicle's passenger, and Defendant Brounson was the driver. (Tr. at 68-69). After identifying himself, Officer Jackson advised the reason for the stop and that Defendant Brounson needed to back off from vehicles he was following. (Tr. at 13). He obtained driver license information from the vehicle's occupants. Defendants advised that the vehicle was a rental which was confirmed when the vehicle registration was checked. (Tr. at 32). As he was speaking with them, the officer observed that both Defendants were "extremely nervous, abnormally nervous" for a traffic stop and that their hands were shaking, their breathing was labored and, although the air conditioning was on high, "sweat beads" were on their faces. (Tr. at 14-15). The officer could also "smell the odor of burnt marijuana coming from inside the vehicle[.]" (Tr. at 14).

For  safety reasons, Officer Jackson asked Defendant Brounson to exit the vehicle and directed him to the back of the Nissan in front of the patrol vehicle in order to prepare a warning ticket. He patted down Defendant Brounson because, in his experience, the odor of marijuana along with Defendant's nervousness indicates the

AO 72A
(Rev.8/82)

possible presence drugs and firearms.  (Tr. at 15, 17, 46-47; Gov't Exh. 1).[7]  The officer also called for back-up and was waiting for that officer to arrive before conducting a search of the vehicle.[8]  (Tr. at 17, 20, 34-35).  As he was writing the warning ticket, Officer Jackson engaged in a general conversation with Defendant Brounson, including asking about travel plans.  (Tr. at 18).  The officer also spoke to Defendant Terry about their travel plans and felt that Defendants provided conflicting information.  (Tr. at 18).  Defendant Terry had initially advised that he lived in Riverdale (located in the opposite direction than they were traveling) but subsequently stated that he was being taken home by Defendant to Cordele (located in the direction that they were traveling).  And Defendant Brounson said that he was going to Cordele to visit friends.  (Tr. at 18, 47-48, 51).  He did not ask Defendants to explain the conflicting information.  (Tr. at 48-49).

---

[7]Defendant Brounson remained in possession of his cellular telephone which, from viewing the video, he appeared to be using during this time.  (Gov't Exh. 1).

[8]Although he does not recall exactly when during the traffic stop, Officer Jackson had provided the information to "run NCIC" on Defendants, but before the search, he had not received back any information.  (Tr. at 19).  He did not recall when the license and registration checks were returned to him.  (Tr. at 31-32).

In order to conduct the vehicle search, based on his detection of the odor of burnt marijuana, Officer Jackson also asked Defendant Terry to exit the vehicle.[9] Officer Torbush arrived and completed the warning citation as he stood near both Defendants.[10]  (Tr. at 20-22, 56-58; Gov't Exh. 1).  As Officer Torbush stood near Defendants, he detected the odor of marijuana coming from their persons.[11]  (Tr. at 57, 62, 66).  No drugs were found on either Defendant.  (Tr. at 59, 63).   Under the front passenger seat of the vehicle, Officer Jackson found two firearms, one with a scratched-off serial number.  (Tr. at 22-23).  No drugs were found in the Nissan.  (Tr. at 36, 49, 63).

Although both officers were K-9 handlers and their K-9s were present, neither officer deployed the dogs around the Nissan.  (Tr. at 23, 30).  Officer Jackson stated that, because he had detected the strong odor of marijuana, there was no reason to

---

[9]There is no indication that Defendant Terry was patted down before being handcuffed.  And he retained possession of his cellular telephone which he appeared to be using while the vehicle search was taking place.  (Gov't Exh. 1).

[10]The officer's arm can be observed in the video of the traffic stop.  (Tr. at 57; Gov't Ex. 1).

[11]Officer Torbush did not search the vehicle nor even approach the vehicle until after the traffic stop was completed; he had no contact with the vehicle; he only detected the odor of marijuana from Defendants.  (Tr. at 58, 62; Gov't Exh. 1).

8

deploy the K-9.  Although his sense of smell is not as good as or as accurate as his K-9's, unlike other drugs, a human is able to detect the odor of marijuana.  (Tr. at 33-34). He also stated, because the K-9 alerts to drug odors by scratching, that he did not want the dog to damage the Nissan needlessly.  (Tr. at 23).  And, when questioned about discussing using the K-9s with Officer Jackson, Officer Torbush replied that he doubted that there would have been any discussion because, "[i]f he smell[s] marijuana, [he's] not going to run [his] dog . . . for [m]ultiple reasons.  Because I-75[,] there's a good chance of the dog possibly getting injured.  Also [the] dogs are what's called aggressive alert dogs, which means they scratch at the source of the odor.  If [he] smell[s] the marijuana, [he's] not going to introduce a dog into that scene and possibly scratch up a paint job just to confirm what I already know."  (Tr. at 63, 66-67).

Shortly after the firearms were found, Defendants were patted down; their cellular phones taken from them; and they were handcuffed.[12]  (Tr. at 22-24; Gov't Exh. 1).  Defendant Brounson was then questioned resulting in the statement that the Government is not going to use at trial.  (Tr. at 69-83; Gov't Exhs. 2 and 4).  On October 7, 2015, Defendants were each charged by a federal grand jury with violation

_____

[12]Although Officer Jackson did not recall exactly when or by whom the cellular telephones were seized, the video indicates both Defendants had possession of their cellular telephones until they were handcuffed.  (Gov't Exh. 1).

9

of 18 U.S.C. § 922(g)(1), felon in possession of a firearm, based on their criminal histories and seizure of the firearms from the Nissan on May 20, 2015. [Doc. 1].

Additional facts will be set forth as necessary in discussion of the motions to suppress.

## II.   Discussion

Defendants seek to suppress evidence, two firearms,[13] seized as a result of a warrantless traffic stop and search of the vehicle in which they were occupants on May 20, 2015. [Docs. 37 and 39]. They contend that Officer Jackson did not observe a traffic violation; therefore, the traffic stop was unlawful. They also contend that credible evidence does not support a finding that Officer Jackson detected the odor of marijuana emanating from the Nissan to establish probable cause for the warrantless search. Defendant Terry, who was not the rental vehicle's driver, contends that he can nevertheless challenge the seizure of the firearms found in the vehicle as fruits of the

---

[13]Although not clear from the briefing of the parties [Docs. 37, 39 and 42] or the evidence introduced at the hearing on the motions to suppress (Tr.; Gov't Exh. 1), each Defendant was also in possession of a cellular telephone now in the Government's possession. As is evident from the video of the traffic stop, both Defendants remained in possession of their telephones until after the firearms were located in the Nissan and they were handcuffed. (Gov't Exh. 1). If, as the court finds, the traffic stop and resulting vehicle search were lawful, then Defendants' arrests were likewise lawful. The arrests apparently resulted in the seizure of the telephones.

10

allegedly unlawful traffic stop.  [Id.].  The Government responds that the totality of the circumstances known to the officer established probable cause for the traffic stop and for the search of the vehicle.  [Doc. 42].  Although not addressing the specific argument made by Defendant Terry to support his right to challenge the seizure of the firearms, the Government contends that Defendant lacked a reasonable expectation of privacy in the vehicle and cannot challenge the warrantless search.  [Id.].  Because Defendants rely in part on arguments that the testimony of the Henry County police officers is not credible and should not be considered by the court, the court will first address the law governing credibility determinations.

   **a.    Credibility**

   Defendants contend that the credibility of Officers Jackson and Torbush is undermined by the inconsistencies in their respective testimony, for example, the failure of the officers to detect of the odor of burnt marijuana from the same source, that is, either from the vehicle or Defendants' persons, and the failure to deploy their K-9s to confirm the odor of marijuana.  They also contend that Officer Jackson's observations regarding the traffic violation is undermined by the video of and how he conducted the traffic stop.  For these reasons, as discussed in more detail *infra*, Defendants argue that the court should disregard various aspects of the officers'

11

testimony which will render the traffic stop and vehicle search unlawful.  [Docs. 34 and 39].  "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002).  In weighing the credibility of a witness, the court takes "into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand." Id. at 750; see also United States v. Wein, 2006 WL 2128155, at *3 (W.D. Pa. July 27, 2006) (noting that "customary techniques to ascertain the credibility of the witnesses" included, but was "not limited to: appearance and conduct of each witness, the manner in which he testified, the character of the testimony given, his intelligence, motive, state of mind, and demeanor while on the stand").  And, unless the evidence "'is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it" or unless the factfinder's determinations appear to be "'unbelievable[,]'" a reviewing court should accept those findings of fact. Ramirez-Chilel, 289 F.3d at 749 (citations omitted); accord United States v. Griffith, 397 Fed. Appx. 613, 617-18 (11th Cir. 2010).

12

The court has evaluated the testimony of each officer based on these guidelines and, for the reasons stated *infra*, finds the officers' testimony credible.

### b.     Defendant Terry's Challenge to the Vehicle Search

First, the court does not construe Defendant Terry's argument to be that he has a legitimate expectation of privacy in the Nissan in which he was a passenger on May 20, 2015.  Instead, Defendant is arguing that, because he can challenge the legality of the traffic stop, if that stop is unlawful, then he may seek to suppress any fruits of the traffic stop.  He contends that the firearms seized from the vehicle are fruits of the unlawful traffic stop.  [Doc. 34 at 6-9].  The Government's only response is to argue that Defendant does not have a legitimate expectation of privacy in the vehicle.  [Doc. 42 at 5].

The Government is correct that Defendant lacks a reasonable expectation of privacy in the Nissan.  The Eleventh Circuit Court of Appeals recently reaffirmed that a passenger in a vehicle, without possessory interest in the vehicle, "'does not have a legitimate expectation of privacy in the interior of the automobile because he does not have the right to exclude others from the car.'"  United States v. Lee, 586 F.3d 859, 864 (11th Cir. 2009), cert. denied, 130 S. Ct. 2392 (2010) (citation omitted); accord United States v. Ubaldo-Viezca, 398 Fed. Appx. 573, 579 (11th Cir. 2010).  In Lee, as

AO 72A
(Rev.8/82)

in this case, the defendant was not the driver of the vehicle searched and was not the owner of the vehicle.  Lee, 586 F.3d at 864-65.  The court held, therefore, that he "failed to meet his burden of establishing a legitimate expectation of privacy" in the vehicle and that, accordingly, the defendant's "Fourth Amendment claim must fail." Id. at 865.  The same is true of Defendant Terry in this case.

However, Defendant Terry is correct that pursuant to the decision in Brendlin v. California, 127 S. Ct. 2400 (2007), a passenger in a vehicle has a limited challenge to a warrantless vehicle stop and search of his person.  In Brendlin, the Supreme Court held that a passenger in an automobile, stopped as the result of a traffic offense, is seized the same as the driver and may challenge the constitutionality of the stop.  127 S. Ct. at 2406-08, 2410.  Thus, a passenger may challenge the recovery of any evidence off his person or statements made as a result of the stop.  Defendant also contends that he may challenge the search of the vehicle if that search produces fruits of an unlawful stop.  Defendant makes this argument, not citing to any legal authority in the Eleventh Circuit Court of Appeals or in other courts, instead, arguing that courts interpreting relevant Supreme Court case law have misapplied those decisions and not properly considered the argument he is making.  [Doc. 37 at 6-9].

14

Although the Eleventh Circuit Court of Appeals has not ruled on the issue presented by Defendant, other appellate and district courts have applied Defendant's arguments to allow a passenger in a vehicle, who contends and establishes that the initial stop was unlawful, to seek to suppress the fruits of the stop, including items found in a subsequent search of the vehicle. See, e.g., United States v. Bah, 794 F.3d 617, 626 (6th Cir. 2015) ("Passengers have standing to contest the lawfulness of their _seizure_ . . . and-in so doing-argue that evidence found during an ensuing vehicle search 'should be suppressed as fruits of illegal activity[.]'") (citation omitted; emphasis in original); United States v. Mosley, 454 F.3d 249, 253 (3rd Cir. 2006) ("passengers in an illegally stopped vehicle have 'standing' to object to the stop, and may seek to suppress the evidentiary fruits of that illegal seizure under the fruit of the poisonous tree doctrine, as expounded in the line of cases following Wong Sun v. United States, [83 S. Ct. 407] (1963)"); United States v. Bian, 2016 WL 2342631, at *5 (S.D. Fla. April 29, 2016) (because a vehicle passenger can contest the lawfulness of the stop, "[i]t follows that, as conceded by the Government . . . , if the stop of an automobile is illegal, the fruits of that illegal stop must be excluded from evidence regardless of the passenger's standing to otherwise contest the search of the car"), adopted by 2016 WL 2587973 (S.D. Fla. May 3, 2016); United States v. Martinez, 537 F. Supp. 2d 1153,

1157 (D. Kan. 2008) (same); United States v. Jones, 374 F. Supp. 2d 143, 154-55 (D. D.C. 2005) (same).  However, as pointed out by the Ninth Circuit Court of Appeals in United States v. Pulliam, 405 F.3d 782 (9th Cir. 2005), if the initial stop is lawful, it would be a rare case where a vehicle's passenger could argue that the continued detention of the vehicle and a subsequent search somehow is the result of an infringement of his personal rights.  Id. at 788-89.  Accordingly, "a passenger with no possessory interest in a vehicle usually cannot object to *its* continued detention or suppress the fruits of that detention . . . ."  Id. at 789 (emphasis in original); and see Mosley, 454 F.3d at 253 (noting that the "dispositive legal issue is the causal relationship between the traffic stop and the discovery of the evidence"); Martinez, 537 F. Supp. 2d at 1157 (defendant bears burden of establishing violation of his rights by the detention and then "of demonstrating a factual nexus between the illegality and the challenged evidence") (citation and internal quotation marks omitted).

In this case, because the court finds that the traffic stop was lawful and did not violate Defendant's Fourth Amendment rights,[14] the court need not decide whether Defendant Terry is entitled to contest the seizure of the firearms as fruits of the

---

[14]And neither Defendant even contends that their continued detention constituted a separate Fourth Amendment violation.  [Docs. 37 and 39].

16

poisonous tree in order to resolve the issues before the court.  The Defendant cannot otherwise challenge the search of the Nissan.  See Lee, 586 F.3d at 864.

**c.     Traffic Stop and Search**

"A traffic stop, which 'is a seizure within the meaning of the Fourth Amendment,' . . . 'is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with Terry[v. Ohio, 88 S. Ct. 1868 (1968)].'"  United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009) (citations omitted).  As the Eleventh Circuit Court of Appeals stated in United States v. Cooper, 133 F.3d 1394 (11th Cir. 1998), "law enforcement 'may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles.'"  Id. at 1398 (quoting United States v. Strickland, 902 F.2d 937, 940 (11th Cir. 1990)); see also United States v. Terry, 220 Fed. Appx. 961, 963 (11th Cir. 2007) (same).  And "[w]hen determining whether an officer had probable cause to believe that a traffic violation occurred, the 'officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under

17

the Fourth Amendment.'"[15]  United States v. Harris, 526 F.3d 1334, 1337 (11th Cir.

2008) (citation omitted); see also United States v. Artiles-Martin, 2008 WL 2600787,

at *5 (M.D. Fla. June 30, 2008) (the defendant's contention that traffic stop was pretext

to conduct search of tractor-trailer foreclosed by Whren).

    Officer Jackson had probable cause to stop the Nissan on the basis of his

observation of a violation of Georgia traffic law, that is, following too closely.  See

O.C.G.A. § 40-6-49(a) ("The driver of a motor vehicle shall not follow another vehicle

more closely than is reasonable and prudent, having due regard for the speed of such

vehicles and the traffic upon and the condition of the highway.").  The evidence at the

hearing established as follows.  On May 20, 2015, Officer Jackson, an experienced

traffic patrol officer, was monitoring traffic as he was stationed on I-75 southbound at

mile marker 214, which is located south of Georgia State Route 155 and north of Bill

---

    [15]The law is well established that "'[s]ubjective intentions play no role in
ordinary, probable-cause Fourth Amendment analysis.'"  United States v. Jones, 377
F.3d 1313, 1314 (11th Cir. 2004) (quoting Whren v. United States, 116 S. Ct. 1769,
1774 (1996)); see also United States v. McGough, 412 F.3d 1232, 1239 (11th Cir.
2005) (indicating that the magistrate judge had improperly discussed the officers'
motives for entering the apartment in resolving the case, the appellate court noted that
the test "is an objective one"); United States v. Hernandez, 418 F.3d 1206, 1209 n.4
(11th Cir. 2005) ("[a]n officer's 'subjective intentions' are not relevant for Fourth
Amendment analysis").  Although not explicitly argued by Defendants, to the extent
their contentions about how the traffic stop was conducted might be read to argue
pretext, those arguments are rejected.

Gardner Parkway, the Tanger Outlet Mall exit.  (Tr. at 4-7).  At approximately 8:20

p.m., he observed the Nissan traveling in the right lane of traffic following less than

one car length behind a tractor-trailer also traveling in that lane.  (Tr. at 7, 38, 40, 53).

Based on his training and experience, Officer Jackson was aware that following too

close is a traffic violation.  (Tr. at 7).  After observing the violation, the officer entered

onto the expressway and moved to catch-up with the Nissan, maintaining his

observation of the vehicle for approximately three miles and noting that the Nissan

continued to follow the tractor-trailer too closely until the tractor-trailer moved into the

center lane.  (Tr. at 8, 39, 42-43).  Although the officer testified that he did not see any

actual danger, in his opinion, given the conditions, the potential for danger was great.

He testified, in the heavy traffic, "[j]ust the vehicle following that closely" posed a

danger.  (Tr. at 44, 46).  The officer's testimony about his observations regarding the

Nissan and the tractor-trailer provides, under Georgia law, sufficient reasonable

suspicion to conduct a traffic stop for violation of O.C.G.A. 40-6-49.

In Garcia-Carrilio v. State, 322 Ga. App. 439, 746 S.E.2d 137 (2013), the

Georgia Court of Appeals relied on similar evidence to reject a defendant's argument

that the traffic stop was unlawful.  In that case, at the request of other law enforcement

officers, a marked patrol unit followed the defendant's vehicle on I-85 southbound.

19

The officer testified that the defendant "was traveling 60 miles per hour about 10 feet behind the tractor-trailer . . . for about a half a mile" when the officer activated his blue lights to stop the vehicle. Id. at 441, 746 S.E.2d at 139. The court held that "the patrol officer's testimony about the distance he observed between [the defendant's] vehicle and the tractor-trailer provided a reasonable suspicion that [the defendant] was following too closely in violation of O.C.G.A. § 40-6-49." Id. at 443, 746 S.E.2d at 140. And see United States v. Whitlock, 493 Fed. Appx. 27, 30 (11th Cir. 2012) (the court affirmed the trial court's finding that the officer's testimony established reasonable suspicion for the traffic stop for following too closely; the officer testified that, when he observed the defendant change lanes, the vehicle was "'practically right on [another] car's bumper[;]'" because of the risk of an accident, he immediately initiated a traffic stop ) (citation not provided).

Defendant Terry first argues that evidence that the Nissan was following too closely without proof of actual danger or apparently other traffic violations is insufficient to establish reasonable suspicion under Georgia law. [Doc. 39 at 9-11]. Defendant, however, offers no legal authority requiring any additional proof beyond that offered by the testimony of Officer Jackson regarding his observations of the heavy traffic conditions and the Nissan following too closely for approximately three

20

miles.  In fact, under the legal authority cited *supra*, no additional proof is necessary for a lawful traffic stop to be initiated.

And Defendants both contend that the video of the traffic stop supports a determination that the officer's testimony is not credible.  [Doc. 37 at 11-13; Doc. 39 at 3-4].  The court has considered the arguments of Defendants but finds that Officer Jackson's testimony about why and when he activated his emergency equipment to conduct the traffic stop, which activated the video recording, is credible and explains why the tractor-trailer was not visible in the recording to document the traffic violation.   Officer Jackson explained that he did not immediately activate his emergency equipment, that is, blue lights and siren, for a number of reasons.  He stated that he is not going to do so until he is behind the vehicle he is stopping because if he activates his lights before that, given the traffic at that time of day, "people start going berserk[.]" (Tr. at 39).  And the officer chose the location where he wanted to conduct the traffic stop, even after catching-up to the Nissan, to avoid a construction zone and a dangerous exit and on ramp (the Tanger Outlet Mall) at a hill crest with merging and exiting traffic.[16]  (Tr. at 8, 28-29, 42-43).  Officer Jackson testified that before he

---

[16]Officer Torbush corroborated Officer Jackson's testimony regarding the construction zone.  The construction zone ran from north of the Tanger Outlet Mall exit to approximately the Eagles Landing exit, ending around mile-marker 213 or 212.

activated his blue lights, the area was a "terrible location to stop a vehicle[.]" (Tr. at 29). The officer estimated that he followed the Nissan for approximately three miles before activating his blue lights. (Tr. at 39, 41). The court finds nothing nefarious in the officer's decision to delay initiating the traffic stop.

The dash video and audio recorder in the officer's patrol vehicle are not activated until the patrol vehicle's emergency equipment is activated. (Tr. at 8). As Officer Jackson testified, when he activates the blue lights, the video portion "go[es] back 30 seconds, and that's when it will start recording[;]" however, the audio portion does not record until the point in time when the blue lights are activated. (Tr. at 8, 27). For that reason, the video of the traffic stop begins thirty seconds before the officer activated his blue lights to conduct the traffic stop of the Nissan. He had "caught up to the vehicle" before the video started and before he activated his blue lights. (Tr. at 12, 42-43; Gov't Exh. 1). Therefore, when the video starts, the Nissan is in the center lane, and the officer's patrol vehicle is in the left-hand lane. The tractor-trailer is not observed on the video. (Tr. at 10; Gov't Exh. 1). The officer did not recall where the tractor-trailer was at this point and could only guess its location. (Tr. at 27-29, 43-44). The video recording, as viewed by this court, which the officer acknowledged was not

_____

(Tr. at 61).

AO 72A
(Rev.8/82)

activated during the time he observed the traffic violation, does not undermine his testimony.[17]

In <u>Hall v. State</u>, 306 Ga. App. 484, 702 S.E.2d 483 (2010), the Georgia Court of Appeals rejected a similar argument made by the defendant, that is, that the video recording of the traffic stop did not capture the tractor-trailer allegedly being followed too closely by the defendant's vehicle and undermined the officer's testimony.  <u>Id.</u> at 485, 702 S.E.2d at 485.  "Based on the officer's testimony that his dashboard camera began to record after the truck that [the defendant] had been following too closely had exited, and based on [the court's] review of the recording, [the court] conclude[d] that the video recording of the traffic stop [did] not establish as a matter of law that the officer did not observe" a traffic violation and held that "the trial court was authorized to find that the officer observed the violation . . . ."  <u>Id.</u> at 485-86, 702 S.E.2d at 485-86 (citing <u>Proctor v. State</u>, 298 Ga. App. 388, 390(1), 680 S.E.2d 493, 495 (2009)).  Likewise, in this case, having considered all of the evidence, the court finds that

---

[17]The officer testified that he did not even think about activating his emergency equipment as soon as he decided to follow the Nissan in order to capture the events he observed.  (Tr. at 39-40).  And the court concludes, based on the officer's testimony about the traffic and roadway conditions, even if he had considered doing so, for the safety of those on the highway, that he would not have conducted the traffic stop differently.

23

Officer Jackson's testimony regarding the reason for the traffic stop is credible and that the traffic stop was lawfully initiated.  Both Defendants were lawfully detained.

The ensuing legality of traffic stops is analyzed under the test set forth in Terry. "[A] traffic stop 'must last no longer than is necessary to effectuate the purpose of the stop.'"  United States v. Ramirez, 476 F.3d 1231, 1237 (11th Cir. 2007) (quoting United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999)); and see Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015) ("the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' - to address the traffic violation that warranted the stop . . . and to attend to related safety concerns"). Absent articulable suspicion of other criminal activity, a traffic stop may last no longer than necessary to process the traffic violation.  United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001).  However, the duration of a traffic stop may be prolonged to investigate, by the use of computer checks, the driver's license and the vehicle registration and, for officer's safety, the criminal history of the driver.  United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003); Purcell, 236 F.3d at 1277-78. Additionally, "[d]uring a lawful traffic stop, officers . . . may take steps that are reasonably necessary to protect their personal safety . . . , including requiring the driver and passengers to exit the vehicle 'as a matter of course.'"  Spoerke, 568 F.3d at 1248

24

(quoting <u>Maryland v. Wilson</u>, 117 S. Ct. 882, 884 (1997); <u>Pennsylvania v. Mimms</u>, 98

S. Ct. 330, 333-34 (1977)).  "Moreover, in connection with a traffic stop, an officer

may conduct a pat down search if he has reason to believe that his own safety or the

safety of others is at risk."  <u>United States v. Smith</u>, 481 Fed. Appx. 540, 543 (11th Cir.

2012).

      The traffic stop was lawfully conducted - as was the search of the Nissan.  After

Officer Jackson activated the blue lights, the Nissan pulled over to the side of the road

followed by the officer.  (Tr. at 12-13).  The officer exited his vehicle and approached,

due to safety concerns with other traffic, the passenger side of the Nissan.  (Tr. at 13).

After identifying himself, Officer Jackson advised the reason for the stop and that

Defendant Brounson, driving the Nissan, needed to back off from vehicles he was

following.  (Tr. at 13, 68).  He obtained driver license information from the vehicle's

occupants.  Defendants advised that the vehicle was a rental which was confirmed

when the vehicle registration was checked.  (Tr. at 32).  As he was speaking with them,

the officer observed that both Defendants were "extremely nervous, abnormally

nervous" for a traffic stop and that their hands were shaking, their breathing was

labored and, although the air conditioning was on high, "sweat beads" were on their

faces.  (Tr. at 14-15).  The officer could also "smell the odor of burnt marijuana

coming from inside the vehicle[.]" (Tr. at 14).  At this point, Officer Jackson was also authorized to detain Defendants and the Nissan to investigate his observations.  See Terry, 88 S. Ct. 1868 (law enforcement officers may also briefly detain individuals for purposes of investigating a crime if they have a reasonable, articulable suspicion based on objective facts that the individual has engaged in, or is about to engage in, criminal activity); United States v. Salley, 341 Fed. Appx. 498, 500 (11th Cir. 2009) (The Eleventh Circuit "has found reasonable suspicion to support further detention based on, among other things, the 'strong odor of marijuana.'") (citation omitted); Harris, 526 F.3d at 1337 (a reasonable, articulable suspicion supports continued detention); United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007) (same).

For safety reasons, Officer Jackson asked Defendant Brounson to exit the vehicle and directed him to the back of the Nissan in front of the patrol vehicle in order to prepare a warning ticket.  He patted down Defendant Brounson because, in his experience, the odor of marijuana along with Defendant's nervousness indicated the possible presence drugs and firearms.  (Tr. at 15, 17, 46-47; Gov't Exh. 1).  See Smith, 481 Fed. Appx. at 543.  The officer also called for back-up and was waiting for Officer

26

Torbush to arrive before conducting a search of the vehicle.[18]  (Tr. at 17, 20, 34-35).

As he was writing the warning ticket, Officer Jackson engaged in a general

conversation with Defendant Brounson, including asking about travel plans.  (Tr. at

18).  The officer also spoke to Defendant Terry about their travel plans and felt that

Defendants provided conflicting information.  (Tr. at 18).  Defendant Terry had

initially advised that he lived in Riverdale (located in the opposite direction than they

were traveling) but subsequently that he was being taken home by Defendant to

Cordele (located in the direction that they were traveling).  And Defendant Brounson

said that he was going to Cordele to visit friends.  (Tr. at 18, 47-48, 51).  He did not

ask Defendants to explain the conflicting information.  (Tr. at 48-49).

In order to conduct the vehicle search, based on his detection of the odor of

burnt marijuana, Officer Jackson also asked Defendant Terry to exit the vehicle.

Officer Torbush arrived and completed the warning citation as he stood near both

Defendants.  (Tr. at 20-22, 56-58; Gov't Exh. 1).  As Officer Torbush stood near

Defendants, he detected the odor of marijuana coming from their persons.  (Tr. at 57,

---

[18]Although he does not recall exactly when during the traffic stop, Officer
Jackson had provided the information to "run NCIC" on Defendants, but before the
search, he had not received back any information.  (Tr. at 19).  He did not recall when
the license and registration checks were returned to him.  (Tr. at 31-32).

62, 66). No drugs were found on either Defendant. (Tr. at 59, 63). Under the front passenger seat of the vehicle, Officer Jackson found two firearms, one with a scratched-off serial number. (Tr. at 22-23). No drugs were found in the Nissan. (Tr. at 36, 49, 63).

Defendants challenge the credibility of the officers' testimony concerning their detection of the odor of burnt marijuana because the officers did not smell the marijuana emanating from the same source, that is, Officer Jackson smelled the marijuana emanating from the vehicle and Officer Torbush smelled the marijuana on Defendants, and because no marijuana was found in the vehicle or on Defendants' persons. [Doc. 37 at 14-15; Doc. 39 at 3-4]. Officers Jackson and Torbush provided information regarding their training and experience to establish that they are familiar with the odor of both raw and burnt marijuana. Officer Jackson was an eleven-year veteran of the police force and had been a traffic officer for over four years. (Tr. at 4-5, 7). The officer was also a certified handler of a K-9 certified to detect the odors of cocaine, methamphetamine, heroin and marijuana. (Tr. at 4-5). He testified that he had conducted hundreds of traffic stops and that he was familiar with the smell of raw and burnt marijuana. (Tr. at 20-21). Officer Torbush, also a K-9 handler, is a ten-year veteran of the police department. (Tr. at 55-56, 61). He testified that, based on his

28

experience conducting traffic stops, he was familiar with the different smells of raw and burnt marijuana. (Tr. at 58). The court finds insignificant the fact that the officers detected the odor of marijuana from different sources - a difference explained by the testimony at the hearing. The important fact is that both officers did detect the odor corroborating each other's testimony. Officer Jackson, who approached the vehicle and spoke with both Defendants, as they remained seated in the vehicle, through the open passenger side window for several minutes, not surprisingly, testified that he smelled the odor of burnt marijuana emanating from the vehicle. (Tr. at 12-15; Gov't Exh. 1). Officer Torbush, who did not even approach the vehicle until after the traffic stop was concluded and did not have any contact with the vehicle but who was only a few feet from both Defendants as they stood in front of the patrol vehicle, not surprisingly, testified that he the smelled the odor of burnt marijuana on Defendants' persons. (Tr. at 56-59, 62; Gov't Exh. 1). The testimony on this point is not even in conflict.

And the fact that no evidence was introduced that marijuana, burnt or otherwise, was found in the vehicle or on Defendants' persons does not refute the officers' testimony. The evidence introduced at the hearing does not foreclose consideration that burnt marijuana might have recently been in the vehicle or in Defendants'

29

possession while in the vehicle. Officer Torbush testified that, with the odor of burnt marijuana, although he has found residue, generally if burnt, no marijuana is left so that a subsequent search does not locate any marijuana. (Tr. at 63-64). In <u>Salley</u>, 341 Fed. Appx. 498, the defendant challenged the finding of the trial court that the officer's testimony was credible that he smelled the odor of burnt marijuana because there was no evidence that the defendant actually possessed or was using marijuana. <u>Id.</u> at 499, 501 & n.4. The court rejected the defendant's argument based on the lower court's finding, following a rigorous cross-examination, that the officer's testimony was credible. <u>Id.</u> at 501. Likewise, in <u>United States v. Dericho</u>, 2015 WL 5687766 (M.D. Fla. September 25, 2015), the court rejected the defendant's argument that the officer's testimony that he smelled burnt marijuana was not credible because no marijuana or related paraphernalia was found during the search of his vehicle. <u>Id.</u>, at **17-18. In that case, the officer "testified that a lack of actual marijuana or related items in the vehicle is not necessarily inconsistent with smelling the odor" because the marijuana could have been smoked in the vehicle earlier or the smell could have been on the defendant's clothing. <u>Id.</u>, at *18. <u>See also</u> <u>United States v. George</u>, 2010 WL 431783, at *8 (E.D. Mo. February 2, 2010) (rejecting the defendant's challenge to the officers' testimony as to the odor of marijuana based on no other evidence of drug possession

or use, the court stated, "in common experience, the pungent odor of any smoked item, even cigarette smoke[,] can linger in a vehicle for quite some time and, thus, a mild odor of burnt marijuana could be smelled by the officers for a significant period of time after the marijuana had been smoked").[19]  Similarly in this case, failure to find actual marijuana does not undermine the officers' credibility.

Also, the court finds, contrary to Defendants' arguments, that the officers reasonably explained why their K-9s were not deployed.  Officer Jackson stated that, because he had detected the strong odor of marijuana, there was no reason to deploy the K-9.  Although his sense of smell is not as good as or as accurate as his K-9's, unlike other drugs, a human is able to detect the odor of marijuana.  (Tr. at 23, 30, 33-34).  He also stated, because the K-9 alerts to drug odors by scratching, that he did not want the dog to damage the Nissan needlessly.  (Tr. at 23).  When questioned about discussing using the K-9s with Officer Jackson, Officer Torbush replied that he doubted that there would have been any discussion because, "[i]f he smell[s] marijuana, [he's] not going to run [his] dog . . . for [m]ultiple reasons.  Because I-75[,] there's a good chance of the dog possibly getting injured.  Also [the] dogs are what's

---

[19]Officer Jackson testified that in his opinion, the odor of burnt marijuana can linger on items such as a vehicle's cloth seats.  (Tr. at 21).

31

called aggressive alert dogs, which means they scratch at the source of the odor. If [he] smell[s] the marijuana, [he's] not going to introduce a dog into that scene and possibly scratch up a paint job just to confirm what I already know." (Tr. at 63, 66-67). See United States v. Peters, 743 F.3d 1113, 118 (7th Cir. 2014) (in rejecting the defendant's challenge to the deputy's claim that he smelled the odor of marijuana based in part on the officer's failure to deploy a near-by police dog, the court found that "there was no need for the deputy to employ a dog specially trained to ferret out subtle odors of illicit drugs when the deputy was 'hit by an overwhelming smell of marijuana' when the window descended") (citation omitted). There is nothing "inherently unbelievable" regarding the officers' testimony. See United States v. Johnson, 445 Fed. Appx. 311, 313 (11th Cir. 2011). And, besides Defendants' contentions, "nothing in the record contradicts [the officers'] testimony" regarding detecting the odor of marijuana. United States v. Zabalza, 346 F.3d 1255, 1259 (10th Cir. 2003).

The odor of burnt marijuana, especially in light of Defendants' excessive nervousness and conflicting travel statements, establishes probable cause for the search of the Nissan. See Merricks v. Adkisson, 785 F.3d 553, 560 n.3 (11th Cir. 2015) ("the smell of burnt marijuana emanating from a vehicle is sufficient probable cause to search a vehicle") (citing United States v. Tobin, 923 F.2d 1506, 1512 (11th Cir. 1991)

32

(en banc)).  Although as a general rule, the Fourth Amendment requires police officers to obtain a warrant before conducting a search, see California v. Carney, 105 S. Ct. 2066, 2069 (1985), in Carroll v. United States, 45 S. Ct. 280, 285 (1925), the Supreme Court established an exception to the warrant requirement for searches of automobiles and other moving vehicles.  Under the "automobile exception," "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." Pennsylvania v. Labron, 116 S. Ct. 2485, 2487 (1996); see also United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006) (indicating that "readily mobile" means "operational"). No separate exigent circumstances need to be shown.  See Maryland v. Dyson, 119 S. Ct. 2013, 2014 (1999); United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003) ("[T]his Court made it clear that the requirement of exigent circumstances is satisfied by the ready mobility *inherent* in all automobiles that reasonably appear to be capable of functioning.") (quoting United States v. Nixon, 918 F.2d 895, 903 (11th Cir. 1990)) (internal quotation marks omitted; emphasis in original).  There is no dispute that the vehicle was mobile having just been stopped by the trooper while operating on the roadway.  (Tr. at 6-8, 12-13).

33

The validity of the search, accordingly, turns on whether there was probable cause to believe the vehicle contained contraband or evidence of a crime. Dyson, 119 S. Ct. at 2014; see also Lindsey, 482 F.3d at 1293 ("The key issue here is whether the police had probable cause for the search and seizure of the vehicle."). "Probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005) (citations and internal quotation marks omitted). As already determined, the detection of the odor of marijuana emanating from the vehicle provided probable cause for the search. See Merricks, 785 F.3d at 560 n.3. The two firearms were, therefore, lawfully seized from the Nissan.

For these reasons, the court **RECOMMENDS** that Defendant's motions [Docs. 24 and 27] to suppress evidence be **DENIED**.

## III.   Conclusion

Based on the foregoing cited authority and for the reasons stated, the court **RECOMMENDS** that Defendants' motions [Docs. 24 and 27] to suppress evidence be **DENIED** and that Defendant Brounson's motion [Doc. 28] to suppress statements be **DENIED** as **MOOT**.

34

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO ORDERED AND RECOMMENDED** this 23rd day of May, 2016.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

35